STATE OF INDIANA, DEPARTMENT OF REVENUE, INHERITANCE
TAX DIVISION *v.* THE ESTATE OF RUSSELL W. POWELL,
DECEASED, EILEEN A. POWELL, EXECUTRIX.

[No. 1-375A51.  Filed August 26, 1975.]

*Theodore L. Sendak,* Attorney General, *Peter C. Americanos,* Deputy Attorney General, for appellant.

*Reller, Mendenhall, Kleinknecht & Milligan,* of Richmond, for appellee *Barnes, Hickam, Pantzer & Boyd,* for Amicus Curiae.

LOWDERMILK, J.—This is an appeal from the final judgment of the Wayne Circuit Court that the executrix, Eileen A. Powell, pay no Indiana inheritance tax on money received by her following the death of her husband.

## FACTS

Russell Powell (Powell) entered the employ of National Automatic Tool Company, Inc. (NATCO) in May, 1955. Prior to his employment, NATCO established a "Salaried Employees Supplementary Pension Plan B" (Plan), and Powell became eligible to participate in June of 1956. Powell supplied the necessary information and signed the required form in order to qualify for the Plan. Powell retired from active employment in October of 1972, but acted as a consultant until his death April 20, 1973. Powell was a qualified member of the Plan at his death.

The Plan was established to supplement Social Security payments and the benefits of a previously established "Plan A." Further, the express words of the Plan state that the purpose was to ". . . establish a pension plan which will qualify under Section 401 of the Internal Revenue Code of 1954 . . ."

Under the terms of the Plan NATCO was to bear the entire cost of purchasing contracts for the benefit of the *qualified* employees.[1]

The "contracts" for which the appointed trustees of the Plan were *required* to apply are defined in the Plan as

". . . any individual retirement income or retirement annuity contract issued by an Insurance Company pursuant to the terms of the plan."

The contracts applied for and purchased were to designate the trustees as the sole owner, and, so far as was available, were to contain uniform provisions for monthly retirement income during life, and death benefits payable to a beneficiary *"of such Participant"* (our emphasis.) should he die. In addition, the Plan states that

". . . each such Contract *in the case of a Participant who* shall be insurable *shall* include initial life insurance protection in an amount sufficient to provide the Death Benefits in an amount equal to at least 100 times the monthly retirement income provided by such Contract." (Our emphasis.)

Thus, while the Plan directs the trustees to seek uniformity, and *requires* "initial life insurance protection,"[2] it is further stated that

". . . The Advisory Committee shall determine the Insurance Companies to which applications for Contracts shall be submitted from time to time and the type and form of such Contracts and any supplements, additions or modifications thereof, and such selection and determination shall be final and conclusive for all purposes of this Agreement."

The trustee was required to establish a special account known as the "Suspense Account," and was to use the funds therein for the payment of premiums next due. This account was only a part of the trust fund, which was comprised of

---

1. Employees who were eligible, but refused or neglected to supply necessary information or co-operation were *permanently* disqualified from participation.

2. There are special provisions whereby one not insurable at standard rates may be insured if the additional amount required is contributed.

"all investments[3] and Contracts held from time to time," and was *not* to contain amounts

"received from an Insurance Company to which either a Participant or a beneficiary shall be entitled hereunder."

The trustees, subject to the terms of the Plan were to be

". . . the complete and absolute owner[s] of all investments and Contracts held hereunder and shall have each and every incident of ownership thereof, *shall have power to sell or assign any such investment or Contract;* to receive all shares of surplus derived from any Contract and all income and capital gains on any such investment; to borrow money on any such investment or Contract and to hypothecate the same to secure any loan and to repay any loan; *to surrender any Contract for cash;* to receive payments of any kind which may be made on any such investment; so far as permitted by law, *to change the persons named in any Contract to receive the proceeds;* to designate any mode of settlement of the proceeds of any Contract that an Insurance Company may allow; to convert any such investment or Contract from one form to another; and without limitation of any of the foregoing to exercise any and all of the rights, [granted by the terms of the investments.]" (Our emphasis.)

In contrast to the extensive powers and duties of the trustees, the insurance companies supplying the contracts have a very limited duty, as illustrated by the following excerpts from § 12.1 of the Plan:

". . . No insurance company shall be deemed to be a party to this Agreement for any purpose, nor shall it be responsible for the validity of this Agreement.

\* \* \*

. . . No Insurance Company shall be required to look into the terms of this Agreement or to question any action of the Trustee or of the Advisory Committee, and no Insurance Company shall be responsible to see that any action of the Trustee or of the Advisory Committee is authorized by the terms of this Agreement, or that any document executed by the Trustee or the Advisory Committee has been authorized by appropriate action of the Trustee or the Advisory Committee, as the case may be. Any Insurance Company

---

3. The trustee was authorized to invest in real and personal property, including, "without limitation," stocks, bonds, notes and commodities.

shall be fully discharged from any and all liability for any amount paid to the Trustee, or paid in accordance with the direction of the Trustee or the Advisory Committee, as the case may be, and any change made or action taken by such Insurance Company upon the written direction of the Trustee, or the Advisory Committee, shall fully discharge such Insurance Company from all liability with respect thereto, and *no Insurance Company shall be obligated to see to the distribution or further application of any monies paid by it to the Trustee or paid in accordance with the direction of the Trustee or the Advisory Committee,* as the case may be." (Our emphasis.)

The Plan provided that any employee-participant retiring at his "normal retirement"[4] date would receive an annuity payable monthly for life. The annuity was computed on the basis of "average plan earnings" and length of employment in some instances. Of course, the trustees were required to purchase additional contracts for each participant whenever there was a salary increment sufficient to move the participant into a higher earning class.

There were further special provisions for those participants who retired later (as here) or earlier than "normal." It should be noted that a participant remaining employed past age 65 could not thereby increase his benefits, and a participant retiring early would receive the benefits of all contracts *then held* for him.

Whenever a participant under the Plan actually retired, the trustee was required to deliver up the contracts held for that participant, and the employee thereafter was no longer a member of the Plan—the retired employee was entitled only to the benefits of the various contracts.

In anticipation of the possibility that a participant would die before retirement, provision was made for the selection by the employee of beneficiaries of the proceeds accumulated for each participant, to-wit:

"Each Participant shall select one or more beneficiaries and contingent beneficiaries to receive upon his death, *while a Participant hereunder,* the Death Benefits under all Con-

---

4. Normal retirement was, generally, at age 65.

tracts then held for his benefit, and shall select the method of payment from such as may be available under each such Contract." (Our emphasis.)

The "Death Benefits" which would pass to a beneficiary are defined as the

". . . aggregate amount of the proceeds and avails of all Contracts then held for his benefit, less any post mortem dividend and premium refund or apportionable premium."

The separate provisions for death after retirement but before ten (10) years had elapsed, state that the monthly payments continue until one hundred twenty (120) such payments are made.

In the case at bar, Powell designated his wife as the beneficiary, and his estate as the contingent beneficiary. Each participant was free to choose the method of payment for the death benefits, provided the method chosen was available under the particular contract. Powell designated his wife receive the death benefits in one lump sum.

The trustees, after Powell qualified for the Plan, purchased contracts for his benefit. In 1972, the contracts held for all participants were converted by the trustees, and the following explanation of that change is given by one of the trustees of the Plan:

". . . From 1954 until the date of this change, the form of contract we had was a retirement income endowment contract, which provided the pension benefits as well as the life insurance benefits for the participants in the plan. It proved to be a rather expensive contract and after consultation with our actuaries and our legal counsel and Connecticut Mutual, we changed each and every one of those retirement income endowment policies in force and effect to a whole life or ordinary life policy, but in so doing it did not change in any respect the benefits to which the participants were entitled under the plan which you have read. It was a saving to National Automatic Tool Company to make this change.

\* \* \*

So basically it was done for a cost—operating cost—savings of National Automatic Tool Company. No change whatsoever in the features of the plan."

Prior to Powell's death, the trustees held five (5) policies in his name, each with the same provisions, as illustrated by the language from one of the policy certificates:

"Policy No. 2,189,395   Participant: Russell W. Powell

| | |
|---|---|
| Employee Plan: | National Automatic Tool Company, Inc. Salaried Employees Supplementary Pension Plan B. |
| Amount of Death Benefit: | $1,470, the Face Amount. |
| Plan of Policy: | Modified Life terminating on the Policy anniversary nearest age 65, with conversion privilege on the Terminal Date to provide a retirement income. Employee Plans Class. |
| Beneficiary upon Death of the Participant | The acting trustees of the National Automatic Tool Company, Inc. Salaried Employees Supplementary Pension Plan B." |

Following the death of Powell, the trustees forwarded the policies to the issuing company, and subsequently received payment thereon. This sequence of events is set out by the testimony of one of the Plan trustees:

"Q.   And did you send these life insurance policies that have been marked Exhibit "A" into the Connecticut Mutual Life Insurance Company?

A.   Yes sir, that's a requirement.

Q.   Yes, and did you, as trustees—you and the others as trustees—receive payment under these policies?

A.   We did.

Q.   And then after you received payment, state whether or not the trustees made a check to the widow of Mr. Powell and whether or not such check was delivered to her.

A.   Yes.

\*   \*   \*

Q.   And the check is for $35,450.02?

A.   Correct.

Q.   And is that the amount your trustees received from the Connecticut Mutual?

A.   That's exactly right.

\*   \*   \*

Q.  But all of that arose from the policies?

A.  Yes it did."

The check sent executrix for the above amount carried the following notation on its face:

"Settlement of all claims under the NATCO Employees' Supplementary Plan B for life insurance contracts on the life of Russell W. Powell . . ."

Given the above facts, the trial court found that:

"[T]he arrangement in this case would appear to fall within the general principles which exclude life insurance proceeds from taxation where the trustee is obligated by an inter vivos agreement to pass said proceeds received by the trustee as beneficiary of the life insurance policies to the designated beneficiaries of the trust."

I.

It is the argument of plaintiff-appellant (State) that the $35,450.02 constitutes death benefits from the NATCO pension plan, and not life insurance proceeds.

The basis for this argument is IC 1971, 6-4-1-1 (Burns Code Ed.), to-wit:

"Inheritance and transfers taxed.—A tax is hereby imposed, under the conditions and subject to the exemptions and limitations hereinafter described, upon all transfers, in trust or otherwise, of the following property, or any interest therein or income therefrom:

When the transfer is from a resident of this state, of real property situated in this state, or of any tangible personal property except such as has an actual situs without this state, or of any and all intangible personal property wherever situated.

\* \* \*

All transfers enumerated in this section shall be taxable, if made by will; or if made by the statutes regulating intestate descent; or if made in contemplation of death of the transferor, and any transfer of property made by a person within two [2] years prior to death, shall, unless shown to the contrary, be deemed to have been made in contemplation of death; *or if made by gift or grant intended to take effect in possession or enjoyment at or after the death of the transferor;* or if made in payment of a claim against the estate of a deceased person arising from a con-

tract or antenuptial agreement made by him and payable by its terms by will or contract at or after his death; and if any transfer falling under the foregoing provisions is made for valuable consideration, excepting love and affection, so much thereof as is the equivalent in money value of consideration received by the transferor shall not be taxed but the remaining portion shall be." (Our emphasis.)

The State contends that Powell designated a beneficiary *under the pension plan,* and the executrix received the money after his death, and, therefore, this is clearly a "gift or grant" which was intended to, and did in fact, take effect "at or after" Powell's death.

These contentions are supported by reference to the provisions of the Plan, set out above, which specify the nature of the benefits due Powell, and the power of the trustees to invest as they may choose. Further, the State notes that the trustees were required to retain a cash balance from part of the trust fund ". . . having regard for the cash disbursements required. . . ."

The State asserts that the above sections conclusively show that executrix was entitled to cash "death benefits," and that the source of those benefits was the pension trust fund—*not* the insurance policies *per se.* The State takes note of the following testimony of a Plan trustee:

"Q. Who was the owner of those policies that were introduced into evidence?
A. The acting trustees of the plan.
Q. Who was the beneficiary of those policies?
    . . .
Q. Just a minute please. The beneficiary, then is the acting trustees?
A. Yes, that is correct. That is correct.
Q. And who did the insurance company pay after the policy came due?
A. The acting trustees of the plan.
Q. Did the insurance company have any obligation whatsoever to pay Mrs. Powell?
A. They did not."

The State argues that this testimony, and all of the above facts, compel the finding that the insurance company had a contract with the NATCO trustees, and that the executrix is limited to a claim based on rights against the plan, not the insurer. Therefore, it argued that the insurance proceeds went to the trustees, and the trustees then paid the executrix from the trust fund.[5]

It is, of course, executrix's position that the money she received was non-taxable insurance proceeds.

Executrix places much reliance on the specific requirements of the pension plan. First, executrix notes that the trustees were required to purchase ". . . initial life insurance protection . . ." with all of the "contracts". It is further noted that if the trustee is beneficiary of the policy, he is required to pay the beneficiary *named by the employee*. Executrix also argues that inasmuch as a pre-retirement payment is not computed by reference to salary, length of employment, or "plan earnings," any pre-retirement benefits are ". . . purely and simply the proceeds of life insurance. . . ." Executrix thus concludes that the trustee is a mere conduit to receive from the insurer the proceeds of the "initial life insurance" and to pay them over to the named beneficiary.

Executrix also attacks the propriety of placing the money received within the definition of a ". . . transfer . . . intended to take effect . . . at or after the death of the transferor." It is contended that, although Powell retained the power to change the beneficiary, any "transfer" was effected in 1959 when Powell designated a beneficiary. Thus, executrix argues there could have been no transfer at Powell's death.

In this same context the executrix points out that the only reason the trustees were a beneficiary of the policies was to relieve the insurance company of the burden of finding and paying the proper person. Therefore, once the company paid NATCO, its liability was at an end. Thus, executrix argues that

---

5. Cases relied upon by the State will be considered below.

the trustees were interposed between the company and her in order to perform specific functions, and such performance has no effect on the nature of the money which passes through their hands.

Finally,[6] executrix contends that the tax statute itself provides the correct answer to the question presented, to-wit:

"Proceeds of life insurance policies on the life of a decedent payable in such a manner as to be subject to claims against his estate and to distribution as a part thereof shall be hereunder held to be a part of the estate, *but payable either directly or in trust for the use of any person or persons other than the estate so that it does not become a part thereof or subject to such claims, said proceeds shall not be taxed.*" (Emphasis appellee's.) IC 1971, 6-4-1-1 (Burns Code Ed.).

## II.

There is no dispute in this case as to the provisions of the Plan or the actions taken by any of the parties with reference thereto. The only issue is whether IC 1971, 6-4-1-1 (Burns Code Ed.) prohibits taxation of the money received by executrix. This question is one purely of law.

Since the enactment of the present inheritance tax statute in 1931,[7] there has been little significant litigation concerning its propriety and general application. Earlier cases have held that the tax imposed is upon the "right of succession" or the "right to take property." *See, Crittenberger* v. *State Savings & Trust Co.* (1920), 189 Ind. 411, 127 N.E. 552; *Armstrong, Admr.* v. *State ex rel.* (1918), 72 Ind. App. 303, 120 N.E. 717.

More recent decisions have made clear that this court must construe the tax statutes most strictly against the taxing authority. *Indiana, Dept. of State Revenue, I.T.D.* v. *Estate of Weinstein* (1967), 141 Ind. App. 399, 229 N.E.2d 741; *Gross Income Tax Division* v. *Na-*

---

6. Cases cited by executrix, and arguments of the *Amicus Curiae* will be considered below.

7. Acts 1931, ch. 75, § 1, p. 192.

*tional Bank & Trust Co., etc., et al.* (1948), 226 Ind. 293, 79 N.E.2d 651.

One recognized exception to the above rule of construction is that any ambiguity in an exemption statute must be construed against the party claiming the exemption. *Gross Income Tax Div.* v. *National Bank* (1948), 226 Ind. 293, 79 N.E.2d 651.

While the parties do not debate the issue of the above rule of construction we feel a brief comment is necessary. The exemptions for the inheritance tax act are found at IC 1971, 6-4-1-3 (Burns Code Ed.). Conspicuously absent there is any mention of life insurance proceeds. The only reference to the non-taxability of insurance proceeds is in the section which imposes the tax.

After a consideration of the placement and structure of the relevant provision, we conclude that it is *not* an exemption section. Rather, it appears that life insurance proceeds are *excluded* in the first instance, and taxed only if it can be shown they were paid in a specific manner. Therefore, we do not here consider an exemption statute which would be construed against the taxpayer seeking such an exemption.

Further, while three other cases have clarified specific portions of the present or predecessor statutes with regard to gifts in contemplation of death,[8] and the inclusion of insurance proceeds in the estate,[9] there has been no Indiana decision which aids us in deciding the question presently before us. Thus, while our primary purpose here has to be the ascertainment of the meaning and intent of the applicable statute, this process must proceed without the benefit of prior judicial consideration of the problem.

In considering the statutory provision immediately in issue, we must, of course, attempt to discern legislative intent

---

8. *Armstrong, Administrator, et al.* v. *State of Indiana ex rel. Klaus, Auditor* (1919), 72 Ind. App. 303, 120 N.E. 717.

9. *In re Estate of Cassner* (1975), 163 Ind. App. 588, 325 N.E.2d 487; *In re Estate of Osland* (1975), 164 Ind. App. 282, 328 N.E.2d 448.

by giving the words and phrases their ordinary meaning, unless they are used in some special or technical sense. IC 1971, 1-1-4-1 (Burns Code Ed.) ; *Dept. of Treasury* v. *Reinking* (1941), 109 Ind. App. 63, 32 N.E.2d 741; *State ex rel. Bynum* v. *LaPorte Superior Court No. 1* (1973), 259 Ind. 647, 291 N.E.2d 355. Further, we must consider the instant problem in light of the entire inheritance tax act. *Reinking, supra.* Once we determine the intent of the Legislature, however, we can go no further. Whether we agree with the purpose or effect of the legislation, we must apply it as it is most correctly interpreted. *Bynum, supra.*

The two paragraphs of the tax act with which we are concerned are neither lengthy nor patently complex. The State relies upon language that

"All transfers enumerated in this section shall be taxable, if made . . . by gift or grant intended to take effect at or after the death of the transferor. . . ." IC 1971, 6-4-1-1 (Burns Code Ed.)

The word "transfer" is defined by the act to include

". . . the passing of property or any interest therein in possession or enjoyment, present or future by inheritance, descent, devise, bequest, grant, bargain, sale or gift, in the manner herein described or the exercise of the right of survivorship in cases of joint ownership." IC 1971, 6-4-1-32 (Burns Code Ed.)

The remaining words and phrases crucial to the State's position are not further defined by the statutes.

The provision which executrix urges as conclusive of the issue states that

"Proceeds of life insurance policies on the life of a decedent payable in such a manner as to be subject to claims against his estate and to distribution as a part thereof shall be hereunder held to be a part of the estate, but payable either directly or in trust for the use of any person or persons other than the estate so that it does not become a part thereof or subject to such claims, said proceeds shall not be taxed." IC 1971, 6-4-1-1 (Burns Code Ed.)

While the *Cassner* and *Osland* cases, *supra*, have elucidated portions of the above, we find no legislative or judicial definition of the key words "life insurance" and "payable directly or in trust," as such words are used in this act. We do take note, however, of definitions found within the statutes pertaining to life insurance companies. In IC 1971, 27-1-12-16 (E) (Burns Code Ed.), it is recognized[10] that proceeds of life insurance policies are not subject to taxation to any greater degree simply because they are payable to a trustee rather than a named beneficiary other than the estate. For this section, proceeds are defined as

". . . any and all benefits payable by the insurer by reason of the death of the insured under any 'life insurance,' 'policy of life insurance,' 'insurance policy,' 'policy,' or 'annuity contract' providing for benefits on the death of the insured, including individual ordinary life policies, certificates issued under a group policy, annuity contracts, and accident or health policies." IC 1971, 27-1-12-16(A) (Burns Code Ed.)

While the above definition is not conclusive, we may consider it as an expression by the Legislature with reference to the specialized area of insurance.

In addition, the trust code, IC 1971, 30-4-1-1 (a), provides the following definition of a trust:

"A trust is a fiduciary relationship between a person who, as trustee, holds title to property and another person for whom, as beneficiary, the title is held."

The above definition is applicable only to private or charitable trusts, and there may be some argument whether it is properly included here. We feel however, that the trust with which we are here concerned is but a special type of personal trust, and not one which could be classified as a "business" or "voting" trust. Therefore, the definition has some instructive value.

At this point then, it can be posited that the inheritance tax statute does not provide for taxation where a trust, as the

---

10. The insurance statutes were promulgated in 1935, after the present tax statutes, and the sections quoted here were added by Acts 1967, ch. 127.

titled owner of the property (policy), receives "any" benefit for the beneficiary from a contract of insurance upon the death of the insured. This, however, is only a secondary consideration. We must first determine whether the executrix actually received insurance proceeds, and this determination rests on the nature of insurance generally, the words of the statute, and the specific provisions of the Plan.

The stated purpose of the Plan was to establish a qualified *annuity*. Certain portions of the Plan support this purpose and set out the means of paying to each Plan participant a monthly retirement income of a specified amount. Further, the "contracts" which the trustees were required to purchase were defined as annuity or retirement contracts. There can be little doubt that the primary purpose of the Plan was post-employment benefits.

The State emphasizes the purpose of the Plan, and notes that the executrix exempted the same $35,450.02 which is in dispute here, under § 2039 (c) of the Internal Revenue Code (IRC) as a qualified annuity. The State then argues that this claim on the federal return is proof of the taxability of the money under the State tax law.

Under the IRC insurance proceeds *are* taxed via § 2042 *if* the decedent possessed an "incident of ownership" at his death. The IRC regulations include as an "incident," the power to change the beneficiary—a power which Powell did have at his death. Thus, the State contends that *if* the proceeds were insurance money they would have been taxed on the federal return—but they *weren't* taxed because they were exempted *as an annuity*.

Under Indiana law, the argument continues, insurance proceeds are *not* taxed unless they are a part of the estate and subject to claims thereof. It is not material that the decedent retained the power to change the beneficiary. An annuity, or pension benefit, probably would be taxed to the beneficiary as a transfer taking effect at death—there are no special ex-

emption statutes. The State thus contends that what is exempt under federal law is taxable under state law and *vice versa*. Therefore, one executrix exempted the money as an *annuity* under federal law, it was taxable under Indiana law —to hold otherwise, the State contends, would allow taxpayers to change the nature of the income to satisfy different taxing authorities.

The State's reading of the two tax statutes is probably correct. However, the conclusions drawn from that reading are unwarranted. We are unable to locate any authority for the proposition that the labeling of a claim on a federal tax return is conclusive of the nature of that claim for Indiana inheritance tax purposes.

Therefore, the incongruous result noted above is possible without a *per se* violation of either taxing statute.

We would agree, however, that the incantation often recited that our statutes differ from the federal because ours is a "receipt" or "succession" tax carries little significance. Beyond indicating *who* should pay the tax ultimately imposed, the emphasis on "succession" diverts attention from the thrust of the statute. Indeed, it could be forcefully argued that Indiana's statute is in fact quite similar to the federal since it taxes transfers where:

a) property passes by will;
b) the decedent has no will and property passes by succession;
c) decedent arranges by contract to pass property at death;
d) the decedent reserves income to himself in a deed of trust;
e) a gift is made in contemplation of death;
f) where insurance proceeds are payable to the estate so that they pass by will or succession;
g) the decedent reserves the power to re-vest the property in himself.

In each of the above circumstances the decedent retained some control over the property. Thus, it could be argued that

as a "divestment" statute, it should be aligned with the federal law. *See*, Note, *The "Transfer Intended" Clause on Indiana Inheritance Tax*, 35 Ind. L. J. 519 (1959-60).

However, even if we were to state that what we are concerned with is the retention of control by the decedent, we still run headlong into the provision which plainly excludes life insurance *if* it is paid in a particular manner. Here, the words of the Plan are crucial.

As noted, the trustees were required ("shall") to purchase "initial life insurance protection" for each insurable participant. While it is arguable that "life insurance" is not used in any technical sense, a close look at the Plan indicates that a special benefit was contemplated.

The provision requiring the selection of a beneficiary for death benefits states that the beneficiary was named in the event there was death *while the employee was a participant*. In contrast, a separate provision for post-retirement benefits states that in the event of death the named beneficiary would receive a total of 120 monthly payments. Clearly, two different situations are involved. This difference is emphasized by the use of an example.

Upon Powell's entrance into the Plan, the trustee was required to purchase retirement contracts that would provide a retirement income commensurate with the wage then paid. In addition, it was required that "initial life insurance protection" equal to 100 times the monthly retirement stipend be purchased. If Powell had died immediately after his acceptance by the Plan, the executrix would have received an immediate lump sum payment. However, had Powell retired at the early date, and then died, the executrix would have received *at most* 120 payments, *and* those payments would have been reduced in amount because the policies in Powell's name gave maximum benefits only at maturity (age 65.)

From the above, it is apparent that there was an element of risk involved for Powell, NATCO and the insurance companies. We cannot agree with the case cited by the State

which imposed a tax partly on the ground that the particular plan involved lacked the risk-shifting usually associated with life insurance. *See, Louis Narvay, Comm'r of Corp. and Taxations* (1971), 358 Mass. 648, 266 N.E.2d 638; generally, 1 Appleman, Insurance Law and Practice, §§ 1-5, 83.

We conclude, therefore, that, under the terms of this particular Plan, there was a risk element sufficient to warrant the further conclusion that monies paid upon Powell's death before actual retirement constituted life insurance proceeds.

We now consider the State's argument that, given the above conclusion, the proceeds went to the trustees and not the executrix, and that the executrix received a cash disbursement from the trust fund.

Under the terms of the Plan, the trustees were the sole owners and beneficiaries of the insurance policies. The executrix had no power to direct either the trustees or the insurance company with regard to the terms of the policies. After Powell's death the insurance company received the policies on Powell's life and forwarded a check to the NATCO trustees. As the testimony above indicates, the trustees then mailed a check for the same amount to the executrix. Here, we note the following section from the Plan:

> "Notwithstanding any such selection and direction of a beneficiary, the Death Benefits of each Contract held for the benefit of a Participant *may* be made payable to the Trustee as beneficiary of record *until the death of the Participant,* whereupon the Employer *shall* notify the Advisory Committee and the Trustee of such death, and the Advisory Committee *shall* direct the Trustee to pay such death benefits *or cause them to be paid to the beneficiary* or beneficiaries and by the method of payment last selected by Participant in accordance with the provisions of Section 7.1 hereof." (Our emphasis.)

We interpret this provision to *require* the trustee to pay the named beneficiary the amount of the insurance proceeds, *or* cause the proceeds to be paid directly to the beneficiary. Thus, while the trustees may be named as beneficiary under

the policies, and the benefits made payable to them, the Plan clearly requires the trustees to pay the same amount received to the *employee's* named beneficiary.

Again we must return to the specific words of the statute. Insurance proceeds are not taxed if paid "directly or in trust *for the use of* any person or persons other than the estate. . . ." Clearly, the proceeds were paid into a trust; neither party disputes this point. We feel it is also clear in this case that the money was paid into the NATCO trust "for the use of" the executrix.

Our taxing statute does not state that only certain types of trusts are considered, nor is it clear what is meant by "life insurance." Certainly the Legislature was aware of the many different types of life insurance, and the several types of trusts. Had it so desired the Legislature could have easily designated what types of insurance proceeds were taxable, and whether such proceeds could be paid into trusts of whatever nature.

While the State contends that the executrix received a cash disbursement of death benefits from the Plan fund, we find nothing that would indicate anything other than the receipt by executrix of the same insurance proceeds which were received initially by the trustees. In this case, we conclude that the handling of the proceeds by the trustees did not alter the character of the money received by the executrix. *See, In re Estate of Dolbert* (1962), 117 Ohio App. 517, 193 N.E.2d 174; *In re Killien's Estate* (1934), 178 Wash. 335, 35 P.2d 11; Annot., 73 A.L.R.2d 157 (1960).

We recognize that our conclusion is somewhat at odds with the general scheme of taxation as we would interpret it. There can be little dispute that insurance policies and proceeds constitute a large exception to the tax laws. This exception, while not perhaps logically sound, has persisted on the basis of general policy arguments which focus on the unique opportunity provided by insurance investment. *See,* C. E. Johnson, T. M. Patterson, *The Indiana Way of Death—*

*Inheritance Tax Impact,* 10 Res Gestae #11, p. 5. Whatever may be the soundness of the legislative approach, we cannot but assume that at this time life insurance (assuming there exists the essential elements of risk-shifting) in simple or mixed (i.e. term insurance until a specific date, with conversion to annuity) form is not taxed even though the trust into which the proceeds are paid is established and maintained by a third-party employer.

Perhaps our conclusions can be amplified by the exposition of a simple example. Assume that a husband entered into a trust agreement with a bank. The terms of the trust are that the trustee is to fund the trust with whole life insurance; that the trust is revocable after fifteen (15) years, at which time the trustor may receive a lump sum, an annuity, or maintain the policies; that the trustee as owner and beneficiary of the policies must pay over any proceeds to the wife; that all proceeds would go to charity if it was determined by the trustee that the trustor had become an alcoholic; and that the trustor may change the ultimate recipient at any time.

We think it clear that such an arrangement would not be taxable to the wife should she receive money from the trustee after the husband's death at a time when the policies were in force and the trust had not been revoked. We further fail to see how such an arrangement, under present law, differs materially from the one under consideration.

At this point it may appear that we have strayed from a consideration of the State's argument that the executrix received a gift or grant "intended to take effect at or after . . . death." The simple answer is that the executrix did receive such a gift. However, the gift was one of insurance proceeds (funneled through a trust), not a part of Powell's estate, and such proceeds are not subject to taxation. It follows that we do not find the cases relied upon by the State, most of which approach the problem from the "transfer intended" position, to be permissible.

While the Attorney General has considered the taxability

of some retirement benefits, the reasoning and conclusions contained in those opinions are not directly applicable here. The facts here are significantly different. *See,* 1961 Op. Atty. Gen. #60, p. 374; 1963 Op. Atty. Gen. #27, p. 130.

We also wish to note that although the *Amicus* brief draws an extensive analogy to group life insurance, in light of the above conclusions, we deem it unnecessary to consider such arguments.

To avoid confusion, we now summarize our conclusions. The Indiana statute excludes life insurance proceeds payable directly or in trust, so long as such proceeds are not a part of the decedent's estate and subject to the claims thereof. Further, the statute does not differentiate between types of insurance proceeds nor types of trusts. *Under the facts of this case,* we conclude that the NATCO plan intended to, and did in fact, embody the crucial characteristics of life insurance. Further, although the proceeds paid upon Powell's death went initially to the Plan trustees, we conclude that they were paid in trust *for the execurtix.* Therefore, the executrix received insurance proceeds which *under the terms of the statute,* are not taxed.

Judgment affirmed.

Robertson, C.J. and Lybrook, J. concur.

NOTE.—Reported at 333 N.E.2d 92.